# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

## COMPLAINT FORM

JOHN CARLO MANIGAULTE

Full name(s) of Plaintiff(s)
(Do not use *et al.*)

v.

Case No. _____
(To be supplied by the Court)

EVERSOURCE ENERGY

Full names of Defendant(s)
(Do not use *et al.*)

## A. PARTIES

1. John Carlo Manigaulte is a citizen of CT _____ who
   (Plaintiff)                    (State)
   presently resides at 66 Franklin Sq., Apt. 2-D, New Britain, CT 06051-2615.
                        (mailing address)

2. Defendant Eversource Energy is a citizen of CT _____
   (name of first defendant)              (State)
   whose address is 107 Seldon St., Berlin, CT 06037-1616.

3. Defendant _____ is a citizen of _____
      (name of second defendant)                              (State)

whose address is _____.

(If more space is needed to furnish the above information for additional defendants, continue on a blank sheet which you should label "A. PARTIES." Be sure to include each defendant's identity and complete address.)

## B. JURISDICTION

The jurisdiction of this court is invoked pursuant to: (list statute(s))

Civil Rights Act of 1964, Rehabilitation Act of 1973, Americans with Disabilities Act of 1990,

ADA Amendments Act of 2008

## C. NATURE OF THE CASE

**BRIEFLY** state the background of your case.

Plaintiff files this Complaint to protect himself from an imminent utility disconnection because Eversource has failed to respond to Plaintiff's request for a "reasonable accommodation" of his speaking disability, caused by emergency surgery that affected his ability to speak at length without incurring significant pain and difficulty breathing. Plaintiff has exhausted all other remedies he is aware of and reluctantly initiates this action as a last resort, given the fact that Eversource has threatened (in writing) to discontinue power to Plaintiff's apartment, an action that could cause Plaintiff to suffer irreparable injuries, as Plaintiff suffers with several medical disabilities (e.g., CAD and advanced degenerative disc disease, which requires electricity in the form of an electric bed and an electric ionizing air purifier). Interactive communication via computer has become a "place of public accommodation" as has been made clearly evident when COVID struck and forced courts of law to go "on-line." Courts "in session" existed in " virtual space," which was as real as it gets, otherwise judges could not have conducted the business of the court via computers. Defendant's phone line is not an acceptable accessibility (communication) substitute for email because Plaintiff experienced considerable " wait times"  and he could not speak long enough on the phone to resolve critical issues regarding his health, safety, and well-being with respect to an imminent utility disconnect. PURA has accommodated Plaintiff' s communication disability, but it has not responded in a timely fashion to prevent injury to Plaintiff due to a utility disconnect threatened by Eversource.

2

## D. CAUSE OF ACTION

I allege that the following of my constitutional rights, privileges, or immunities or my rights under a federal statute have been violated and that the following facts form the basis of my allegations: (If more space is needed to explain any allegation or to list additional supporting facts, continue on a blank sheet which you should label "D. CAUSE OF ACTION.")

**Claim I:** Eversource has created a communication barrier that violates federal law.

This barrier is physical in the sense that communication cannot occur except through a medium.

Without air we cannot speak. Without a physical means to exchange words, we cannot communicate.

Supporting Facts: (Include all facts you consider important, including names of persons involved, places, and dates. Describe exactly how each defendant is involved. State the facts clearly in your own words without citing legal authority or argument.)

On January 05, 2023, Eversource representative "Michelle" called Siudzinski and Plaintiff. Since Plaintiff's throat was hurting him (due to a Post-Surgical Disability), Siudzinski spoke on Plaintiff's behalf and explained to Eversource that electrical usage in the apartment had been consistent and that the tremendous increase in the received bill was not logical. After further discussion, Siudzinski noted that Plaintiff was a disabled individual and that Plaintiff was requesting the reasonable accommodation of communicating via email, rather than over the phone, so that he could explain that he recently moved to Connecticut so he needed time to locate in state medical providers and that for medical reasons he needed uninterrupted electrical power or he could suffer severe physical and emotional injuries. Eversource has failed to create a means by which speech-disabled persons can effectively communicate with Eversource. In our modern age, email is an effective medium of communication. Not to have a means for open email communication is to present speech disabled persons with a barrier to effective and appropriate communication in violation of federal law.

**Claim II:** Eversource functions as a public entity because it provides an essential service.

Eversource discriminates against disabled Plaintiff in the provision of benefits, services, etc.

Eversource receives federal funding and is heavily regulated. See additional claims labeled "D."

Supporting Facts:

On February 01, 2023, Plaintiff and Siudzinski emailed PURA to let PURA know that Eversource's technician exchanged their apartment's old analog meter for a new digital meter and stated in the presence of a witness (the landlord) that the ERT reading he obtained with Eversource's ERT device was different from the reading on the analog meter. Despite the readings being different, Eversource never altered the amount "owed" by Plaintiff and Siudzinski. On February 27, 2023, Plaintiff and Siudzinski received a "Shutoff Notice" from Eversource, indicating a "Delinquent Balance" of "$648.10." No mention was made of the faulty meter on which that amount was based. No mention was made about fulfilling Plaintiff's request for a reasonable accommodation as regards communicating with Eversource and as regards negotiating for affordable electricity, given the fact that electricity is an essential service without which life might cease to exist, especially for Plaintiff, a disabled senior. (See "D. Cause of Action.") By overcharging financially distressed Plaintiff for an essential service, Eversource violates federal law.

### E. REQUEST FOR RELIEF

WHEREFORE, plaintiff demands: (state the relief you seek)

A temporary or permanent injunction ordering the Defendant to maintain electric service to Plaintiff's apartment without willful discontinuation and to comply with all of the requirements of the ADA and other relevant federal and local statutes. An order stating that the Defendant must negogiate in good faith reasonable accommodations for disabled persons as regards removing communication barriers and providing affordable electricity as it is an essential service without which disabled persons could very likely suffer irreparable injury. A temporary or permanent injunction prohibiting Defendant from recalibrating Plaintiff's new meter without first informing Plaintiff as well as PURA of any recalibrations. An order stating that the Defendant must explain in writing its meter replacement policy and provide evidence to Plaintiff and to PURA that Defendant's meters are not and have not been overcharging consumers within the past 20 years, given that Plaintiff's meter was a 1995 model. An order stating that Defendant must provide PURA with any evidence that indicates a discrepancy between feeder meters and the multiple customer meters connected to them.

### F. JURY DEMAND

Do you wish to have a jury trial?   Yes Yes          No

_____    *John C. Manigaulte*
Original signature of attorney (if any)    **Plaintiff's Original Signature**

    John C. Manigaulte

_____    
Printed Name    Printed Name

( )    (631) 372-9073
Attorney's full address and telephone    Plaintiff's full address and telephone

    66 Franklin Square, Apt 2D, New Britain, CT 06051

Email address if available    Email address if available

    jomng1@aol.com

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he/she is the plaintiff in the above action, that he/she has read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at 66 Franklin Square, New Britain CT on April 26th, 2023.
      (location)       (date)

*John C. Manigaulte*
**Plaintiff's Original Signature**

(Rev.3/29/16)

5

**"D. CAUSE OF ACTION."**

On October 20, 2022, Plaintiff and his fellow renter David Siudzinski signed documents to move into their apartment at 66 Franklin Square, New Britain, CT 06051-2615. On that day, Siudzinski signed up for Eversource as the sole provider for their apartment's electricity.

On December 28, 2022, Plaintiff and Siudzinski received a bill that was nearly double what they had paid the previous month (i.e., $229.41 for the November bill). There appeared to be no logical basis for this bill. Their usage of electricity did not dramatically increase in any way.

On January 03, 2023, Siudzinski searched through Eversource's website to dispute this exorbitant bill, but discovered that the only way to contact Eversource was by phone. Siudzinski called up Eversource and spoke with representative "Elizabeth"--later identified as a credit specialist, who informed Siudzinski that, "Our electric meter readings don't lie." She further noted that Siudzinski could pay $30 to have the meter checked for its accuracy. That evening, Siudzinski sent an email to Connecticut's Public Utilities Regulatory Authority (PURA) about the phone call and the lack of accommodation for people with disabilities, such as Siudzinski's fellow renter (or "roommate"). In pertinent part of the email, Siudzinski noted, "My roommate is a disabled senior who would not survive electricity and heat being shut off."

On January 05, 2023, Eversource representative "Michelle" called Siudzinski and Plaintiff. Since Plaintiff's throat was hurting him (due to a Post-Operative Disability), Siudzinski spoke on Plaintiff's behalf and explained to Eversource that electrical usage in the apartment had been consistent and that the tremendous increase in the received bill was not logical. After further discussion, Siudzinski noted that Plaintiff was a disabled individual and that Plaintiff was requesting a reasonable accommodation of communicating via email, rather than over the phone. Eversource's website has no means by which to communicate via email with anyone at Eversource, which is why phone communication became how Siudzinski could reach Eversource. On the phone, Siudzinski noted that he lives with a disabled senior (i.e., Plaintiff). Eversource noted that the only way to dispute a bill was to place a phone call and wait for a customer service representative. There was no option to write or email Eversource.

On January 9, 2023, Plaintiff received a letter from the HRA Energy Assistance Program, approving Plaintiff's household for a basic benefit of $600 to go toward the amount owed to Eversource because the Siudzinski-Manigaulte household fit within HRA's "financial hardship" guidelines.

On January 12, 2023, PURA emailed Plaintiff and Siudzinski informing them they could have a PURA engineer witness their meter being tested in the lab by Eversource.

On January 21, 2023, landlord and an outside electrician checked Plaintiff's breaker box and found that when the breakers were shut off there was still "an 8amp draw." The electrician advised having the meter examined for possible damage or possibly failure to operate correctly.

On January 24, 2023, Eversource representative "Latoya" called Siudzinski and Plaintiff to discuss a meter exchange to occur on January 31, 2023. Plaintiff's voice was hurting him due to

1

a Post-Operative Disability. What little he could speak had been expended when he spoke with a Nurse Practitioner from Aetna earlier that day. Siudzinski informed Eversource, once again, that Plaintiff was voice-disabled and he wanted to communicate with Eversource about financial hardship, the faulty meter, energy disconnect possibilities, and other issues. Eversource explained to Siudzinski their procedure for Plaintiff to obtain medical documentation to prevent a power disconnect and then provided a fax number.

On January 31, 2023, Eversource sent one of its technicians to change Siudzinski and Plaintiff's meter. The Eversource technician discovered and indicated that there was a discrepancy between the ERT transmission, which records the meter reading and electrically sends it out to a computer in an Eversource vehicle, and the physical meter reading on the meter itself. Plaintiff and Siudzinski engaged in a "Q&A" regarding what to make of faulty meters and faulty meter readings. Plaintiff and Siudzinski took photographs of the discrepancies noted.

On February 01, 2023, Plaintiff and Siudzinski emailed PURA to let them know that the ERT reading and the meter reading of their apartment's meter were different when Eversource's technician exchanged the old analog meter for a new digital meter. Despite the reading being off, Eversource never altered the amount "owed" by Plaintiff and Siudzinski.

On February 27, 2023, Plaintiff and Siudzinski received a "Shutoff Notice" from Eversource, indicating a "Delinquent Balance" of "$648.10." No mention was made about the faulty meter on which this amount was based. No mention was made about fulfilling Plaintiff's request for a reasonable accommodation as regards communication and Eversource providing affordable electricity, given the fact that electricity is an essential service. Plaintiff and Siudzinski sent two faxes to Eversource stating that Plaintiff has a disability that requires the heat to remain on and that should the power be disconnected then Eversource would be sued in federal court for violating the ADA. Of further note, the first fax stated, in pertinent part, "[Plaintiff and Siudzinski] have been paying the reasonable fee of $160/month while we await a reasonable accommodation for [Plaintiff's] disability and Eversource's test results."

On February 28, 2023, Plaintiff and Siudzinski called Eversource and informed them that Plaintiff and Siudzinski had received an HRA Energy Assistance Program approval of $600. Eversource stated they would make note of this information. Eversource also stated that any funds sent from HRA to Eversource would be applied to the account. To this day, Siudzinski and Plaintiff have not received communications regarding the HRA approved amount. Eversource acknowledged receiving a fax indicating that Plaintiff has several medical conditions that require uninterrupted electrical service.

Eversource stated that in order for them to place "medical protection" on the account, they would need a doctor to use Eversource's medical portal to confirm Plaintiff's disabilities. Eversource asked whether or not Plaintiff and Siudzinski would like to get on a verified hardship plan. Plaintiff submitted proof of financial hardship through Eversource's online portal. Eversource "pre-qualified" Plaintiff and Siudzinski for hardship protection, and Eversource then placed Plaintiff and Siudzinski on Eversource's "Winter Protection Plan" and allowed Plaintiff and Siudzinski 60 days (after March 12, 2023) to verify hardship, meaning Plaintiff and Siudzinski would be safe from disconnect until May 12, 2023. This pre-qualified plan, however, was not the

same as Eversource's "Medical Protection Plan," which would ostensibly provide for permanent protection from a willful power disconnect. And, Eversource's website indicates that their "Winter Protection Plan" ends May 1, 2023. These "mixed communications" confused Plaintiff as well as Siudzinski, both of whom decided that it was best to file a lawsuit because there was no written communication clarifying Eversource's intentions. Eversource's verbal communications (over the phone) were contradictory at best.

On March 07, 2023, Plaintiff and Siudzinski observed a meter test conducted at Eversource's "lab" (66 Curtis Street, New Britain, CT 06052). This meter test was witnessed by PURA Engineer Steve Capozzi. The test was performed by an Eversource meter-tester named "Dave." Dave noted that the meter was "from 1995." Furthermore, when Dave went to test the meter, he had problems getting the test "initialized." It took Dave over five minutes of troubleshooting just to obtain a reading. Plaintiff and Siudzinski presented a litany of questions to Dave, none of which he could answer sufficiently because, as he stated, "I'm just a meter tester." At the end of the meter test, Dave printed a sheet with the title "Meter Calibration Accuracy Test Report." In the "Comments" section, not a word was noted.

On March 11, 2023, Plaintiff and Siudzinski's many concerns regarding the meter test were forwarded in writing to PURA. Toward the end of the email in question, Plaintiff and Siudzinski stated: "Since Dave (Eversource) could not answer some of our questions, as he was not (as he stated) an electrical engineer or "radio guy," we would like to interview (again, by using video and audio recording) an Eversource electrical engineer in the presence of a PURA electrical engineer. Please let us know when this interview can be scheduled, as some of our most important questions have not been answered."

On March 12, 2023, Plaintiff and Siudzinski received a letter (dated March 10, 2023) from Eversource's Customer Service Department, stating, in pertinent part, "we have tested electric meter #878605322…and [the test] showed a meter accuracy of 099.55%. This is well within the parameters for meter accuracy established by state regulators."

On March 13, 2023, PURA Consumer Information Representative Rosalind Gwynn sent an email to Plaintiff and Siudzinski stating, "I am seeking guidance on the technical inquires and will respond as soon as possible."

On April 06, 2023, Plaintiff and Siudzinski sent a fax, responding to Eversource's March 10, 2023 letter. In the fax, Plaintiff and Siudzinski noted that Eversource's meter tester was unable to answer a litany of questions about the meter or explain why Eversource "was strategically replacing meters without testing them." Furthermore, the fax went on to state, in pertinent part, "[Plaintiff and Siudzinski] have estimated a 'reasonable accommodation cost' of $185.'" Plaintiff and Siudzinski have duly paid $185 per month after the sending of their fax.

On April 13, 2023, Plaintiff and Siudzinski made eight attempts to fax Eversource, but every attempt failed. Three times at Staples, the fax would not go through. Five times at a UPS Store, the fax would not go through. Eversource does not maintain adequate written communication resources for its disabled customers.

On April 14, 2023, Plaintiff and Siudzinski made another attempt to fax Eversource. This time, the fax was attempted at a FedEx Store. The fax would not go through. Instead, Plaintiff and Siudzinski sent the fax materials via certified mail to Eversource's listed street address (107 Seldon St., Berlin, CT 06037-1616). These fax materials noted, in pertinent part, that Plaintiff underwent surgery two years prior, and that his surgery resulted in him having difficulty speaking for extended periods of time. Plaintiff was also told by medical personnel that his throat might never fully recover from the surgery.

Plaintiff and Siudzinski requested an email by which to contact Eversource's "Customer Service" unit as a reasonable accommodation of his disabilities. Further discussed was the fact that HRA had awarded funds to the household, but that the funds were "very slow in arriving." Also stated in the fax was that neither Plaintiff nor Siudzinski was satisfied with the meter test Eversource provided. Plaintiff and Siudzinski offered to pay $185 "for peak electric use." Eversource did not respond to this very important fax.

Several of Plaintiff's disabilities were enumerated in the fax: Plaintiff suffers with "(CAD, cervical stenosis, cervical myelopathy, etc.)" along with the danger of "becoming more disabled or possibly injured by a planned (and totally avoidable) interruption of electric power to [Plaintiff's] apartment." Plaintiff noted in the fax that he sleeps in an electric bed and cannot safely remove himself from its fully reclined position (for sleeping with neck and spine support) if there's no electric power. A copy of the HRA Energy Assistance Program award of $600 was included with the fax, along with a copy of the "Unable to send fax: Error" page from Staples. On that page Plaintiff and Siudzinski noted in writing that they had attempted to fax Eversource several times and all of their attempts had failed. Further noted was that Plaintiff was on the lease and that since Plaintiff was "new to Connecticut," he had yet to locate medical specialists to assist him as needed.

On April 17, 2023, Plaintiff and Siudzinski called Eversource and spoke with representative "Vinna." Plaintiff informed Vinna that he has a disability regarding speaking and asked if he could receive the reasonable accommodation of emailing Eversource. Vinna stated, "We don't have anybody to do email back and forth with…we don't have someone set aside that can answer emails. We don't have a (sic) email address to give to the customers." Plaintiff asked about Eversource's "matching payment plan," but neither Plaintiff nor Siudzinski could understand Vinna's verbal explanations of this financial hardship plan. Plaintiff asked Vinna about the certified letter he had sent to Eversource, which includes a copy of the HRA Award Letter. Vinna said it hadn't come through yet. When Plaintiff asked if his name could be added to the account, Vinna transferred Plaintiff to another department which then transferred Plaintiff to representative "Diane." Diane stated that she had placed Plaintiff's name on the account. Plaintiff then asked Diane about the certified letter and Diane transferred Plaintiff to an automated line that hung up on Plaintiff, after stating that no one was available to speak and that callers should call back during regular business hours.

Plaintiff and Siudzinski wrote an email to PURA in which they complained about Eversource's lack of a reasonable accommodation of Plaintiff's several disabilities as well as the time-sensitive issue regarding energy disconnect and their past due balance dispute.

On April 18, 2023, PURA responded to Plaintiff and Siudzinski, noting, in pertinent part, that the inquiry was "under review" by PURA's "technical and legal experts." PURA further noted that their inquiry was being expanded "to include the matter of appropriate assistance and ADA compliance related to customers with limited speaking ability." PURA thanked Plaintiff and Siudzinski for their patience and noted that they "have contacted Eversource" on behalf of Plaintiff and Siudzinski. No further explanations or statements were made until April 20, 2023.

On April 20, 2023, Plaintiff emailed PURA stating that, according to his interpretation, "The ADA does not permit a utility provider to demand medical documentation *on a periodic basis* to justify protection from a 'discontinuation of service' [and] Eversource discriminates against me (a disabled senior with advanced degenerative disc disease, CAD, and other disabilities) by FORCING me to ask my medical providers to periodically verify my disability. I have a RECORD of having a disability, which is defined, in large part, by my age and by the nature of the disability, itself." Plaintiff also asked PURA to file for injunctive relief on his behalf due to the danger of an impending power shutoff, previously threatened by Eversource.

Eversource responded, "We have received your inquiry/complaint and it's under review." Because Eversource's "deadline" for its "Winter Protection Plan" is quickly approaching and Plaintiff and Siudzinski have no written (or verbal) communications from either PURA or Eversource indicating that there will not be a power disconnection on May 1st, Plaintiff was forced to request assistance from the court.

## **CLAIM 1**

Electricity is an essential service. In this modern age where everything from heat to refrigeration, to stovetops, to microwaves, to toasters, to computers, runs on electricity. There is little that can be done in our modern age without electricity, including cooking and operating medical equipment. People rely on electricity for health, safety, mobility, and even survival.

As such, a company like Eversource provides an essential service without which the community could not safely function. So intertwined is Eversource with the community that it receives government funding through customers who have been awarded government-support via HRA and other state and federal programs. Government funds do not enter Plaintiff's bank account; instead, they go directly to the utility provider. This "direct transfer" of funds precludes Eversource arguing that they are not connected to federal funding.

One questions whether Eversource is truly the same as other private companies. If another private company were to cease to offer its product, certainly the sun would continue to rise. Yet, if Eversource were to stop providing electricity tomorrow, the mechanisms of our entire society would cease to function in a normal fashion, until power was resupplied.

With this in mind, it is not an overstatement to conclude that a utility like Eversource is an essential service without which society could not function safely in our modern age. There certainly exist VIP clubs which legally restrict public access. However, one would tremble at the thought of an electric company arbitrarily deciding who should and who should not receive electricity. A utility company that produces so essential a product as electricity requires a higher

5

degree of regulation and oversight than an independent business whose product is not integral to the safe and healthy functioning of modern-day life.

Plaintiff sleeps in an electric recliner and without electricity he would surely suffer injuries attempting to extricate himself from the recliner. Even with assistance, Plaintiff cannot extricate himself from his recliner when it is in "sleep mode" without Plaintiff suffering substantial pain for a considerable amount of time. Plaintiff must return his recliner to its "stand-up mode" in order for him to safely exit his recliner.

Defendant, Eversource, by threatening to shut off Plaintiff's electricity, risks injuring Plaintiff by making it nearly impossible for Plaintiff to sleep, by rendering his electric recliner inoperable. Additionally, should the power be shut off, Plaintiff risks having a heart attack or stroke due to his history of Coronary Artery Disease (CAD) and what cold temperatures (or hot temperatures) do to his blood pressure; they substantially (and therefore dangerously) elevate his blood pressure.

## CLAIM 2

Not only is it necessary for Eversource to provide a reasonable accommodation to disabled customers regarding their medical needs, but also regarding the affordability aspect of electricity, since electricity is so essential to everyday modern life, especially when one is a senior citizen, more so when one is a disabled individual (as is Plaintiff), who is at great risk of injury or death should there be a power disconnect.

According to "Protecting Older Adults from Utility Disconnection," a brief supported by a contract from the U.S. Department of Health and Human Services: "Access to affordable utility service is essential to protect the health and safety of older adults and is critical to promoting aging in place with dignity."

## CLAIM 3

Eversource has also harassed Plaintiff by requiring him to jump through a plethora of administrative hoops simply to perpetually prove his disabilities, which are collectively life-long disabilities. Eversource does not provide an email by which to communicate with them. One of Plaintiff's disabilities is Post-Operative Sore Throat which, in a typical case, can last up to two years post-surgery—Plaintiff underwent major surgery on his neck in July of 2021.—In Plaintiff's case, however, medical personal informed Plaintiff that his throat might never fully recover from intubation and general anesthesia. Because of his surgery, Plaintiff cannot speak for long periods of time without his voice giving out, causing him to have difficulties breathing as his throat swells up and becomes further irritated. Dr. Anna Stern, an otolaryngologist in New York, examined Plaintiff's throat via an apparatus and showed him on her computer screen where his throat was irritated, just above his vocal cords.

Plaintiff read somewhere that the Americans With Disabilities Act of 1990 was instituted by the legislative branch of the federal government as a response to the Judiciary too narrowly construing previous laws that were meant to protect people living with disabilities. Plaintiff also

6

read somewhere that the ADA Amendments Act of 2008 was instituted as a response to the Judiciary too narrowly construing the intentions of the original ADA of 1990. Plaintiff's cursory research suggests that Congress intended to protect as many people living with disabilities as possible, even though Congress itself, perhaps, did not adequately or appropriately spell out its intentions when it enacted the 1990 version of the ADA.

With all of this in mind, it seems reasonable to suggest that the Defendant's website violates several disability rights guaranteed under the ADA of 1990 and the ADA Amendments Act of 2008. Defendant Eversource would have to make its website accessible to voice-disabled customers (like Plaintiff) by providing them an interactive and time-sensitive means to email Eversource.

As an important point of fact, Eversource owns a subsidiary called "Aquarion Water Company," whose website allows for email communication. Yet, Eversource's website does not allow for email communication. If Eversource can provide an email communication for its subsidiary, why then not for its main website?

The federal government acknowledges (as of June 27, 2014) Plaintiff John C. Manigaulte's "total and permanent disability" with respect to the discharge of student loans. The U.S. Department of Education reviewed Plaintiff's medical records and after "a three-year post-discharge monitoring period" fully discharged loans based upon Plaintiff John C. Manigaulte's "total and permanent disability."

See attached letter from NELNET, U.S. Department of Education.




June 27, 2014



>02541 4294221 001 008187
JOHN C MANIGAULTE
165 ARDITO AVE
KINGS PARK, NY 11754-3644

Account Number: 274683

Dear JOHN C MANIGAULTE:

The U.S. Department of Education (the Department) has completed its review of your application for a total and permanent disability discharge of your Federal Family Education Loan (FFEL) Program, Federal Perkins Loan (Perkins Loan) Program, and/or William D. Ford Federal Direct Loan (Direct Loan) Program loan, and/or your Teacher Education Assistance for College and Higher Education (TEACH) Grant Program service obligation. Throughout this letter, we use the term "loan" to refer to one or more loans.

The Department has discharged your loan or TEACH Grant service obligation on the basis of your total and permanent disability. This cancels your obligation to repay the loan or complete the teaching service you agreed to perform as a condition for receiving a TEACH Grant. However, the discharged loan or TEACH Grant service obligation will be reinstated if you do not meet certain requirements during a post-discharge monitoring period that will be in effect for three years from the discharge date, Jun 18, 2014.

In this letter, we provide important information. First, we explain the requirements you must meet during the three-year post-discharge monitoring period. Next, we close the letter with the information you will use to contact us. Finally, as part of an included enclosure, we list your loan or TEACH Grant service obligation. If applicable, we then list other loans we have identified that may be eligible for discharge based on your total and permanent disability.

Three-Year Post-Discharge Monitoring Period

As explained above, the Department has discharged a specific loan and/or TEACH Grant service obligation due to your total and permanent disability. You are now subject to a monitoring period that will end three years from the discharge date included in this letter.

During the monitoring period, you—

- Must not have annual employment earnings that exceed the Poverty Guideline amount for a family of two in your state, regardless of your actual family size;

- Must not receive a new Perkins or Direct Loan, or a new TEACH Grant; and

- Must ensure the return of a loan disbursement to the loan holder or TEACH Grant disbursement to the Department within 120 days of the disbursement date, in the case of a loan or Teach Grant that was made before the discharge date, but was disbursed during the three-year post-discharge monitoring period.

B08



>09666 4914432 001 008187

JOHN C MANIGAULTE
165 ARDITO AVE
KINGS PARK, NY 11754-3644

☐ CORRECTED (if checked)

| CREDITOR'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Date of identifiable event  6/28/14 | OMB No. 1545-1424 | **Cancellation of Debt** |
|---|---|---|---|
| U.S. Department of Education  P.O. BOX 87130  Lincoln, NE 68501-7130 | 2 Amount of debt discharged  $ 158,869.46 | 2014 | |
| 1.888.303.7818 | 3 Interest if included in box 2  $ 11,628.70 | Form **1099-C** | |
| CREDITOR'S federal identification number  52-1198289 | DEBTOR'S identification number  xxx-xx-7784 | 4 Debt description  Federal Student Loan | | Copy B For Debtor |
| DEBTOR'S name  JOHN C MANIGAULTE | | | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported. |
| Street address (including apt. no.)  165 ARDITO AVE | 5 If checked, the debtor was personally liable for repayment of the debt ▶ [x] | | |
| City or town, state or province, country, and ZIP or foreign postal code  KINGS PARK, NY 11754-3644 | | | |
| Account number (see instructions)  861112985 | 6 Identifiable event code  F | 7 Fair market value of property  $ | |

Form **1099-C**   (keep for your records)   www.irs.gov/form1099c   Department of the Treasury - Internal Revenue Service

## Instructions for Debtor

You received this form because a Federal Government agency or an applicable financial entity (a creditor) has discharged (canceled or forgiven) a debt you owed, or because an identifiable event has occurred that either is or is deemed to be a discharge of a debt of $600 or more. If a creditor has discharged a debt you owed, you are required to include the discharged amount in your income, even if it is less than $600, on the "Other income" line of your Form 1040. However, you may not have to include all of the canceled debt in your income. There are exceptions and exclusions, such as bankruptcy and insolvency. See Pub. 4681, available at IRS.gov, for more details. If an identifiable event has occurred but the debt has not actually been discharged, then include any discharged debt in your income in the year that it is actually discharged, unless an exception or exclusion applies to you in that year.

Debtor's identification number. For your protection, this form may show only the last four digits of your social security number (SSN), individual taxpayer identification number (ITIN), or adoption taxpayer identification number (ATIN). However, the creditor has reported your complete identification number to the IRS and, where applicable, to state and/or local governments.

Account number. May show an account or other unique number the creditor assigned to distinguish your account.

Box 1. Shows the date the earliest identifiable event occurred or, at the creditor's discretion, the date of an actual discharge that occurred before an identifiable event. See the code in box 6.

Box 2. Shows the amount of debt either actually or deemed discharged. Note. If you do not agree with the amount, contact your creditor.

Box 3. Shows interest if included in the debt reported in box 2. See Pub. 4681 to see if you must include the interest in gross income.

Box 4. Shows a description of the debt. If box 7 is completed, box 4 also shows a description of the property.

Box 5. Shows whether you were personally liable for repayment of the debt when the debt was created or, if modified, at the time of the last modification. See Pub. 4681 for reporting instructions.

Box 6. Shows the reason your creditor has filed this form. The codes in this box are described in more detail in Pub. 4681. A—Bankruptcy; B—Other judicial debt relief; C—Statute of limitations or expiration of deficiency period; D—Foreclosure election; E—Debt relief from probate or similar proceeding; F—By agreement; G—Decision or policy to discontinue collection; H—Expiration of nonpayment testing period; or I—Other actual discharge before identifiable event.

Box 7. If, in the same calendar year, a foreclosure or abandonment of property occurred in connection with the cancellation of the debt, the fair market value (FMV) of the property will be shown, or you will receive a separate Form 1099-A. Generally, the gross foreclosure bid price is considered to be the FMV. For an abandonment or voluntary conveyance in lieu of foreclosure, the FMV is generally the appraised value of the property. You may have income or loss because of the acquisition or abandonment. See Pub. 4681 for information about foreclosures and abandonments. If the property was your main home, see Pub. 523 to figure any taxable gain or ordinary income.

Future developments. For the latest information about developments related to Form 1099-C and its instructions, such as legislation enacted after they were published, go to www.irs.gov/form1099c.